MCDERMOTT WILL & EMERY LLP
William G. Gaede III (136184)
3150 Porter Drive
Palo Alto, CA 94304-1212
Telephone: (650) 813-5000
Facsimile: (650) 813-5100

Attorneys for *J.R. Carlson Laboratories, Inc. and Metagenics, Inc.*

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

NORDIC NATURALS, INC.

Plaintiff,

v

J.R. CARLSON LABORATORIES, INC. and METAGENICS, INC.

Defendants.

AND RELATED COUNTERCLAIMS

Case No. C-07-2385 MJJ

**DEFENDANTS' CLAIM CONSTRUCTION BRIEF**

Date: March 12, 2008
Time: 9:00 a.m.
Courtroom: 11

Honorable Martin J. Jenkins

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

McDermott Will & Emery LLP
Attorneys At Law
Palo Alto

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ..... 1

II. BACKGROUND OF THE TECHNOLOGY ..... 2

III. LEGAL FRAMEWORK FOR CLAIM CONSTRUCTION ..... 2

IV. THE TWO PRIMARY CLAIM CONSTRUCTION DISPUTES ..... 5

A. "Water-Soluble Flavoring" and "Flavored Gelatin Capsule" Include Sweeteners and Other Ingredients That Affect or Alter the Taste of the Gelatin Capsules ..... 5

B. The Claimed Ranges of Flavoring, Water and Softener in the Gelatin Capsules Requires That Such Concentrations Are Within the Specified Range Throughout the Gelatin Capsule ..... 9

1. The Intrinsic Record Requires That Water Soluble Flavoring Be Present Throughout the Gelatin Capsule ..... 9

2. The Claim Language Limits Plaintiff's Claims to the Stated Ranges of Water, Water Soluble Flavoring, and Gelatin Softener ..... 11

V. THE SECONDARY CLAIM CONSTRUCTION DISPUTES ..... 12

A. Gelatin Softener ..... 12

B. Palatable, Palatability ..... 12

C. Gelswatch ..... 13

VI. CONCLUSION ..... 13

# TABLE OF AUTHORITIES


Page

**CASES**

*Abbott Labs. v. TorPharm, Inc.*
300 F.3d 1367 (Fed. Cir. 2002) ........ 3

*Alpex Computer Corp. v. Nintendo Co. Ltd.*
102 F.3d 1214 (Fed. Cir. 1996) ........ 4, 7

*Ballard Med. Prods. v. Allegiance Healthcare Corp.*
268 F.3d 1352 (Fed. Cir. 2001) ........ 4, 11

*Bell Atl. Network Servs., Inc. v. Covad Communs. Group, Inc.*
262 F.3d 1258 (Fed. Cir. 2001) ........ 3

*CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co. KG*
224 F.3d 1308 (Fed. Cir. 2000) ........ 5

*Cytologix Corp. v. Ventana Med. Sys., Inc.*
424 F.3d 1168 (Fed. Cir. 2005) ........ 2

*Ekchian v. Home Depot, Inc.*
104 F.3d 1299 (Fed. Cir. 1997) ........ 4, 7

*Gillespie v. Dywidag Systems*
501 F.3d 1285 (Fed. Cir. 2007) ........ 4, 7

*Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*
381 F.3d 1111 (Fed. Cir. 2004) ........ 3

*Interactive Gift Express, Inc. v. Compuserve, Inc.*
256 F.3d 1323 (Fed. Cir. 2001) ........ 3

*Laitram Corp. v. Rexnord, Inc.*
939 F.2d 1533 (Fed. Cir. 1991) ........ 6

*Liebel-Flarsheim Co. v. Medrad, Inc.*
358 F.3d 898 (Fed. Cir. 2004) ........ 6

*Phillips v. AWH Corp.*
415 F.3d 1303 (Fed. Cir. 2005) (en banc) ........ 2, 3, 5

*Rheox, Inc. v. Entact, Inc.*
276 F.3d 1319 (Fed. Cir. 2002) ........ 3

*Southwall Techs., Inc. v. Cardinal IG Co.*
54 F.3d 1570 (Fed. Cir. 1995) ........ 5

*Springs Window Fashions L.P. v. Novo Indus., L.P.*
323 F.3d 989 (Fed. Cir. 2003) ........ 4

*Vitronics Corp. v. Conceptronic, Inc.*
90 F.3d 1576 (Fed. Cir. 1996) ........ 3, 4

*Vivid Technologies, Inc. v. American Science & Engineering, Inc.*
200 F.3d 795 (Fed. Cir. 1999) ........ 12

**STATUTES**

21 C.F.R. § 172.585 ........ 8


McDermott Will & Emery LLP
Attorneys At Law
Palo Alto

## TABLE OF AUTHORITIES
## (continued)

**Page**

**OTHER AUTHORITIES**

*Webster's New World College Dictionary*, 3rd Ed. (1995) ...................................................... 7, 8

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

McDermott Will & Emery LLP
Attorneys At Law
Palo Alto

## I. INTRODUCTION

Plaintiff Nordic Naturals, Inc.'s ("Nordic Naturals" or "Plaintiff") two patents, U.S. Patent No. 6,346,231 ("'231 Patent") and U.S. Patent No. 6,652,879 ("'879 Patent")[1] are directed towards a common concern: improving the taste of soft-gelatin capsules that contain unpleasant tasting fish oils.[2] There is a long history in the art of increasing compliance by consumers through improving the taste of medicines and food supplements, including those encapsulated in gelatin. Allegedly, Plaintiff's claims narrowly resolved this concern by patenting the addition of a defined concentration of a small amount of water soluble flavoring in a gelatin capsule that encapsulates the fish oil. Now, Plaintiff seeks through claim construction to limit its narrow claim further to exclude prior art in one aspect, and to stretch in another aspect to try to ensnare the gelatin fish oil capsule products of J. R. Carlson Laboratories, Inc. and Metagenics, Inc. (collectively "Defendants").

The "intrinsic" record of the patents' claims, the specification, and the prosecution histories show Plaintiff's attempt to twist the claims lacks basis. Specifically, on the two main claim construction issues:

- Plaintiff may not read limitations into the '231 and the '879 patents to exclude from the phrase "water soluble flavoring" those water soluble substances such as sugar that improve the taste and flavor of the gelatin capsules by increasing their overall sweetness. Proper construction does not inject additional limitations to exclude sweeteners while permitting other forms of flavoring. Defendants' construction is in agreement with Plaintiff's own patent claims, the specification, admissions of claim scope in the prosecution history, as well as the extrinsic art and dictionary definitions;

- The '231 and the '879 patents cannot be stretched to encompass gelatin capsules that have water soluble flavoring present in only part of the gelatin capsule in the narrow specified concentration range listed in the claims. Proper construction limits the '231 and '879 patents to water soluble flavoring that is present throughout the gelatin capsule within the defined concentration. Again, the plain claim language, the specification, admissions in the prosecution history, and extrinsic evidence support Defendants' construction.

---

[1] U.S. Patent Nos. 6,346,231 and 6,652,879 are attached as Exhibits A and B to the Declaration of Brian L. Baker in Support of Defendants' Claim Construction Brief ("Baker Decl.").

[2] The term "gelatin capsule" and "gelatin capsule shell" are used interchangeably in the prosecution history of the patents and in this brief, both meaning the shell portion as opposed to the filling inside the capsule (the "fill").

Defendants respectfully request that the Court construe the '231 and the '879 patent claims consistent with the intrinsic record and reject Plaintiff's attempt: (1) to limit the scope of what constitutes a water-soluble flavoring to exclude sweetness; and (2) to permit the gelatin capsule to have uneven distribution of the water-soluble flavoring ingredient that fails to satisfy the concentration limitation of the claims. Other issues identified in the Joint Claim Construction Statement are not material to the resolution of this case, but are addressed as well in Section V.

## II. BACKGROUND OF THE TECHNOLOGY

Soft gelatin capsules have been available since the 1930's. The gelatin capsule shell is composed of gelatin, plasticizer and water, and may contain additional ingredients. As the specification teaches, the gelatin capsule is formed from the "gelswatch," which is a mixture of the ingredients. From this gelswatch, the capsule shell itself is formed and filled with the "fill" ingredients, *e.g.* fish oil, by an encapsulation machine.

As the prosecution history of the patents and the prior art cited make clear, Plaintiff did not invent flavoring gelatin capsules. Numerous prior art examples existed stretching back at least to the 1980's. (Baker Decl., Ex. K (exhibits B and C).) As a result, Plaintiff was required to limit the claims to a narrow invention that comprised a gelatin capsule (1) where "water" is "present in said gelatin capsule" "in a concentration between about 6% and 10% and where the capsule comprises "a water soluble flavoring" that "is present in a concentration between about 0.50% and about 1.50% of said gelatin capsule."[3] (*See* Baker Decl., Ex. A.) Plaintiff has asserted claims 1-4 and 16 of the '231 Patent and claims 1-6 of the '879 Patent.

## III. LEGAL FRAMEWORK FOR CLAIM CONSTRUCTION

Claim construction is a question of law and "follow[s] the methodology set forth in [the] *en banc* decision in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc)." *Cytologix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168, 1172 (Fed. Cir. 2005). "It is a

[33] The asserted claims of the '879 patent limit water soluble flavoring to be "in a concentration which is in the range between about 0.25% and about 1.5%" of the flavored gelatin capsule.



MCDERMOTT WILL & EMERY LLP ATTORNEYS AT LAW PALO ALTO

'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude'." *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004); *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("we look to the words of the claims themselves . . . to define the scope of the patented invention"). The analytical focus begins with and remains centered on the language of the claims themselves. *See Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001). In other words, the claim language provides substantial guidance as to the meaning of a disputed claim term. *See Phillips*, 415 F.3d at 1314.

The ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay people because the term "involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. In cases where the meaning of the term is not commonly understood to lay people, the court looks to a variety of sources that would also be available to the public, namely "words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* (quoting *Innova/Pure Water*, 381 F.3d at 1116).

After examining the plain language of the claims, the "specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582.

The prosecution history is to be examined to determine whether a patentee has limited or defined the scope of the claims. *Bell Atl. Network Servs., Inc. v. Covad Communs. Group, Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001); *see also Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319, 1325-27 (Fed. Cir. 2002) (statements made during prosecution may also offer interpretative assistance to the court in construing a particular claim). The "prosecution history may limit claim scope if the patentee disclaimed or disavowed a particular interpretation of the claims during prosecution." *Abbott Labs. v. TorPharm, Inc.*, 300 F.3d 1367, 1372 (Fed. Cir. 2002). Indeed, explicit statements made by a patentee during prosecution that distinguishes its claimed

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

invention over prior art can narrow the scope of a claim. *See, e.g., Ballard Med. Prods. v. Allegiance Healthcare Corp.*, 268 F.3d 1352, 1361-62 (Fed. Cir. 2001) (finding a disclaimer of broader claim scope where patentee distinguished the claimed valves from the prior art valves).

A patent applicant who, in overcoming a rejection by the PTO, makes a clear avowal regarding the invention is estopped from later asserting an inconsistent position during claim construction. *Alpex Computer Corp. v. Nintendo Co. Ltd.,* 102 F.3d 1214, 1221 (Fed. Cir. 1996) ("Just as prosecution history estoppel may act to estop an equivalence argument under the doctrine of equivalents, positions taken before the PTO may bar an inconsistent position on claim construction. . . ."); *Ekchian v. Home Depot, Inc.,* 104 F.3d 1299, 1304 (Fed. Cir. 1997) ("[B]y distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover, [and] he is by implication surrendering such protection.").

Further, the patentee is held to what he declares during the prosecution of the patent. *Gillespie v. Dywidag Systems*, 501 F.3d 1285, 1291 (Fed. Cir. 2007). "The public notice function of a patent and its prosecution history requires that a patentee be held to what he declares during the prosecution of his patent." *Springs Window Fashions L.P. v. Novo Indus., L.P.*, 323 F.3d 989, 995 (Fed. Cir. 2003).

Extrinsic evidence encompasses all evidence that is not part of the patent itself (the claims and specification) or of the prosecution history of the patent. *See Vitronics*, 90 F.3d at 1584. If the meaning of the claim limitation is apparent from the intrinsic evidence alone, it is improper to rely on extrinsic evidence other than that used to ascertain the ordinary meaning of the claim limitation. *Id.* at 1583. "In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term." *Id.* However, in the rare circumstances that the Court is unable to determine the meaning of the asserted claims after assessing the intrinsic evidence, it may look to additional evidence that is extrinsic to the complete document record to help resolve any lack of clarity. *Id.* at 1584. Extrinsic evidence may always be used by the Court to educate itself regarding the technology of the patents-in-suit; it may not be used to vary, contradict, expand, or limit the claim language from how it is defined, even by implication,

in the specification or file history. *See CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1318 (Fed. Cir. 2000).

"[U]ndue reliance on extrinsic evidence poses the risk that it will be used to change the meaning of claims in derogation of the 'indisputable public records consisting of the claims, the specification and the prosecution history,' thereby undermining the public notice function of patents." *Phillips*, 415 F.3d at 1319 (quoting *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed. Cir. 1995)). In contrast, undue reliance on the intrinsic evidence must be tempered by "one of the cardinal sins of patent law – reading a limitation from the written description into the claims." *Id.* at 1320. The *Phillips* court opined that this sin could be avoided by distinguishing between words that restrict the invention to a specific description, from words that exemplify how to practice an invention. *Id.* at 1323.

McDermott Will & Emery LLP
Attorneys At Law
Palo Alto

## IV. THE TWO PRIMARY CLAIM CONSTRUCTION DISPUTES

### A. "WATER-SOLUBLE FLAVORING" AND "FLAVORED GELATIN CAPSULE" INCLUDE SWEETENERS AND OTHER INGREDIENTS THAT AFFECT OR ALTER THE TASTE OF THE GELATIN CAPSULES

Each of the asserted claims in the '231 and the '879 patents refer to "water soluble flavoring," while each of the claims of the '879 patent also refer to "flavored gelatin capsule." The ordinary meaning of "water-soluble flavoring" as used in the patent claims – and as confirmed by the intrinsic record – means "a substance that has the capacity to affect the sense of taste and that is susceptible to being dissolved in water." Joint Claim Construction Statement ("JCCS") (Docket No. 30), Ex. A, p. 2, J.R. Carlson and Metagenics Proposed Construction.

Plaintiff improperly reads into these claims a limitation to narrow the meaning of "flavoring" to be "a substance or material used to alter the natural flavor, ***as opposed to the sweetness***, of a food item that can be easily dissolved in water." The parties agree that the substance must be easily dissolved or soluble in water, they disagree on whether flavoring excludes water-soluble substances such as sugar, saccharin and other substances that affect the taste sensation of sweetness.

Neither patent contains claim language that exclude substances that sweeten from the claim term "flavoring" and "flavored." Claim 1 of the '231 patent states:

> A fish oil capsule for palatable presentation of fish oil comprising: (a) a gelatin capsule, said gelatin capsule comprising gelatin, a gelatin softener, water, *and a water soluble flavoring*, wherein said water is present in said gelatin capsule in a concentration between about 6% and about 10%, and wherein said water soluble flavoring is present in a concentration between about 0.50% and about 1.50% of said gelatin capsule;

(Baker Decl., Ex. A, col. 4, ll. 26-34 (emphasis added).) Similarly, Claim 1 of the '879 patent states:

> A *flavored gelatin capsule* suitable for encapsulating a dose, said flavored gelatin capsule comprising gelatin, a gelatin softener, water, and *a water soluble flavoring*, wherein said water soluble flavoring is present in said flavored gelatin capsule in a concentration which is in the range between about 0.25% and about 1.5% of said flavored gelatin capsule. . . .

(Baker Decl., Ex. B, col. 4, ll. 35-41 (emphasis added).)

The remainder of the intrinsic record confirms that Plaintiff never limited the ordinary meaning of "flavoring" to exclude ingredients that alter or affect the taste of gelatin capsules by sweetening them. First, the lack of limitation on what constitutes a "flavoring" in Claim 1 of the '231 patent should be contrasted to the dependent Claim 3, which expressly references species of possible flavorings.[4] Differences among claims can be a useful guide in understanding the meaning of particular claim terms. *See Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed. Cir. 1991). The presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004). As such, "flavoring," as used in Claim 1, is much broader than as used in Claim 3.

Second, the specification supports that the ordinary meaning of "flavoring" includes a broad range of materials that alter the "taste" of the gelatin capsule, which a sweetener plainly does. The background of the invention makes clear that flavoring is tied to the sensation of "taste." ("The ***taste*** of many medicinal and nutritive components can be quite distinctive and

---

[4] Claim 3 of the '231 patent claims: The fish oil capsule claimed in claim 1, wherein said water soluble flavoring is chosen from the group consisting of berry, strawberry, chocolate, cocoa, vanilla, lemon, nut, almond, cashew, macadamia nut, coconut, blueberry, blackberry, raspberry, peach, lemon, lime, mint, orange, banana, chili pepper, pepper, cinnamon, and pineapple. (Baker Decl., Ex. A, col. 4, ll. 42-47.)

McDermott Will & Emery LLP
Attorneys at Law
Palo Alto

potentially unpleasant. Improvements in the ***taste*** of certain drugs and nutritional supplements can lead to a higher compliance by consumers.") (Baker Decl., Ex. A, col. 1, ll. 12-15 (emphasis added).) The summary of the invention ties flavoring to taste, *viz*: "The flavoring of the capsule improves the ***taste*** and ***palatability*** of the capsule and will subjectively improve the ***taste*** of the gelatin and a dose or contents contained within the flavored gelatin capsule to individual consumers or patients." (*Id.* at col. 2, ll. 17-21.) Such express statements that flavoring is tied to taste (with sweetness being one of the sensations of taste[5]) undercuts any argument that the specification expressly excludes sweeteners from the definition of "flavoring."

Third, Plaintiff's representations to the PTO are consistent with Defendants' construction and inconsistent with Plaintiff's current position that "flavoring" excludes sweetening agents. During prosecution of the '231 Patent, Plaintiff distinguished over prior art by stating that the specific reference "does not anticipate adding ***flavorants or sweetening agents*** to the gelatin capsules, ***which is a key point in all of the claims.***" (Baker Decl., Ex. D at pp. 5-6.) Plaintiff expressly avowed to the public that a key point of the claims included sweetening agents, and is binding on Plaintiff. *See Gillespie*, 501 F.3d at 1291; *Alpex Comp. Corp.,* 102 F.3d at 1221; *Ekchian,* 104 F.3d at 1304. Plaintiff's expressed public representations to the PTO directly contradict Plaintiff's litigation attempt to twist the claims into excluding sugars and other sweeteners from the terms "water soluble flavoring" and "flavored gelatin capsule."

A bevy of extrinsic evidence supports Defendants' position that the ordinary definition of "flavoring" includes a broad range of ingredients that alter the taste, including the sweetness, of the gelatin capsule. First, the dictionary offers insight into what constitutes "flavoring." To start, the definition of "taste" is:

> That one of the five senses that is stimulated by contact of a substance with the taste buds and is capable of distinguishing basically among *sweet, sour, salt, and bitter*: the flavor or any specific substance is usually recognized by its combined taste, smell, and texture.

(Baker Decl., Ex. C, p. 1370 (emphasis added).) Next, the definition of "flavor" is:

[5] *Webster's New World College Dictionary*, 3rd Ed. (1995), p. 1370 (definition of "taste"). (Baker Decl., Ex. C.)



McDermott Will & Emery LLP Attorneys At Law Palo Alto

> Any substance added to a food, medicine, etc. to give it a particular taste; flavoring.

(*Id.* at p. 515.) Sweetness is a sensation of taste, and flavor is a substance that stimulates the taste buds, which sweeteners plainly do.

Second, the Food and Drug Administration has determined that sugar, such as that extracted from sugar beets, "is used as a flavor in food." *See* 21 C.F.R. § 172.585.

Third, other patents in the relevant field of soft gelatin capsules support the ordinary definition of "flavoring" as including sweeteners. The specification of a 1984 patent on chewable soft elastic gelatin capsules that Plaintiff cites in the Joint Claim Construction Statement, U.S. Patent No. 4,428,927, states:

> Suitable taste modifiers or flavorings are used in the fill composition, the gelatin composition, or in both simultaneously. The particular taste modifier and/or flavor that is used may vary widely. Similarly, the proportions between various taste modifiers and/or flavors vary widely according to the taste desired. The taste modifiers and/or flavorings may be desirably selected from the following: cherry syrup, citric acid, dextrose, essential oil (i.e., clove, lemon, orange, peppermint, spearmint), ethyl vanillin, glucose, honey, mannitol, methyl salicylate, raspberry syrup, saccharin, saccharin sodium, sorbitol, sucrose, wild cherry syrup, and mixtures thereof.

(Baker Decl., Ex. E, col. 4, ll. 13-26.)

*Remington's Pharmaceutical Sciences*, a leading treatise, lists numerous sweeteners, including dextrose, glucose, glycerin, mannitol, saccharin, sorbitol, and sucrose as "flavoring agents." (Baker Decl., Ex. F, p. 1231.) Further, in an article titled "Softgels: Manufacturing Considerations," sugar, such as sucrose, is listed along with ethyl vanillin and essential oils as ingredients that can be added to gelatin to improve the taste of the gelatin capsules. (Baker Decl., Ex. G, p. 422.

In sum, "flavoring" should be construed in accordance with its plain and ordinary meaning, the intrinsic record, and the extrinsic evidence to include all flavoring substances, including sweeteners.

**B. THE CLAIMED RANGES OF FLAVORING, WATER AND SOFTENER IN THE GELATIN CAPSULES REQUIRES THAT SUCH CONCENTRATIONS ARE WITHIN THE SPECIFIED RANGE THROUGHOUT THE GELATIN CAPSULE**

Both the '231 and the '879 patent claims set forth a limited acceptable range of the overall percentage of total ingredients present in the gelatin capsules. For example, Claim 1 of the '879 patent claims:

> A flavored gelatin capsule suitable for encapsulating a dose, said flavored gelatin capsule comprising gelatin, a gelatin softener, water, and a water soluble flavoring, *wherein said water soluble flavoring* ***is present in*** *said flavored gelatin capsule* ***in a concentration*** *which is in the range between about 0.25% and about 1.5% of said flavored gelatin capsule*, and wherein said water ***is present in*** said flavored gelatin capsule ***in a concentration*** in the range between about 6% and about 10% of said flavored gelatin capsule. . . .

(Baker Decl., Ex. B, col. 4, ll. 35-44 (emphasis added).) Express in the ordinary meaning of the emphasized phrase, as construed in its entirety, is that throughout the gelatin capsule, the claimed "concentration" of water or water soluble flavoring is "present" in the capsule within the stated ranges, as Defendants contend is the proper construction. *See* Joint Claim Construction Statement (Docket No. 30), Ex. A at pp. 3-4.

Plaintiff seeks to avoid this claim language by defining the terms "present in" and "about" separate from the entire claim phrase. Plaintiff separately defines "present in" as "present ***as part*** of the capsule, as opposed to the fill," in order to circumvent the limitation that the stated ingredients must be present throughout the gelatin capsule in the specified "concentration." Plaintiff's definition of "about" as "to within acceptable manufacturing tolerances," improperly broadens the stated concentration ranges of water and water soluble flavoring that Plaintiff would assert its patents cover. In fact, nowhere in the claims does the term "acceptable manufacturing tolerances" appear. Plaintiff's attempt to broaden the scope of its claims clashes with the ordinary meaning of its claims, and thus Defendants' proposed construction should be adopted.

**1. The Intrinsic Record Requires That Water Soluble Flavoring Be Present Throughout the Gelatin Capsule**

While not dispositive, the specification makes clear that the ingredients used to make the gelatin capsules, including any flavoring, are heated and thoroughly mixed together. (Baker

Decl., Ex. A, col. 3, ll. 28-34.) Thus, the example of manufacturing is consistent with the claims' requirement that the water-soluble flavoring be present "in" the gelatin capsule within the identified concentrations. The specification does not contain any language stating that the flavoring be present only in "part" of the gelatin capsule, as Plaintiff would have it.

The prosecution history confirms that the claims require that the ingredients be distributed in the gelatin capsule in the stated concentration of the claims. Plaintiff repeatedly told the Examiner that the narrow acceptable ranges of water soluble flavoring and other ingredients were never expressly stated in the prior art and that these ranges were critical to ensure even distribution throughout the gelatin capsule. For example, Plaintiff asserted that "too little water . . . results in a distorted unpleasant taste, probably due to ***uneven distribution*** or precipitation of flavoring materials," (Baker Decl., Ex. D, p. 5) and that "[o]verly dried shells were also found to be unpalatable since the ***water soluble flavoring is unevenly distributed***. . . ." (Baker Decl., Ex. H, p. 7 (emphasis added).) The inventor himself even declared to the Examiner that he "found that these harder capsules [(too little water)] were also unpleasant to the taste because the flavor ***was not evenly distributed in the capsule.***" (Baker Decl., Ex. I, p. 3 (emphasis added).) Per Plaintiff's own admissions, the '231 and the '879 patents' claims require that the water soluble flavor be more than just "present as part of the capsule," as Plaintiff now proposes, but that the flavor ***must be evenly distributed throughout the capsule*** in the concentration specified.

Further, Plaintiff argued that "[t]he major distinction of the instant invention is inclusion of flavoring ***in*** *the gelatin capsule shells* of a capsule filled with fish oil to promote palatability of the fish oil in a capsule filled with fish oil." (*See* Baker Decl., Ex. L at p. 2 (emphasis in original).) In addition, Plaintiff asserted that the prior art "does not disclose a range of concentrations for the flavoring ***in*** *gelatin capsule shells*." (*Id.* at p. 3 (emphasis added).)[6]

---

[6] Extrinsic evidence further confirms Plaintiff's representations to the Examiner that the water soluble flavoring in the gelatin must be distributed throughout the capsules in the identified concentrations. Wilkinson's article entitled "Softgels: Manufacturing Considerations" stresses the importance of efficient mixing and blending of the ingredients in the gelswatch prior to encapsulation. (Baker Decl., Ex. G, pp. 423-25.)



MCDERMOTT WILL & EMERY LLP ATTORNEYS AT LAW PALO ALTO

There is no basis to stretch the plain claim language to cover such concentrations only in "part" of the gelatin capsule. In sum, the claim language, the specification, and particularly the prosecution history, all demonstrate the correctness of Defendants' construction.

**2. The Claim Language Limits Plaintiff's Claims to the Stated Ranges of Water, Water Soluble Flavoring, and Gelatin Softener**

The prosecution history of the two patents also confirms that the concentration ranges in the claims are narrowly construed rather than open to interpretation based upon a vague measure of "acceptable manufacturing tolerances" as Plaintiff argues. In addition to not mentioning "acceptable manufacturing tolerances" in the claims or specification, Plaintiff repeatedly told the Examiner that its claimed invention was distinguishable from the prior art because of the specific concentration ranges of the ingredients in its gelatin. Explicit statements made by a patentee during prosecution that distinguishes its claimed invention over prior art narrow the scope of a claim. *See, e.g., Ballard Med. Prods. v. Allegiance Healthcare Corp.*, 268 F.3d 1352, 1361-62 (Fed. Cir. 2001).

Specifically, Plaintiff distinguished two pieces of prior art, the Coapman '961 patent, and the Brox '988 patent, by stressing the criticality of having the claimed range of 6% to 10% water in the gelatin shell and that this range fell directly between these two patents, which claimed "above 15% water" and "0% water," respectively. (*See* Baker Decl., Ex. D, p. 4-5; Ex. H, p. 5-7; Ex. J.) Plaintiff represented to the Examiner that the Coapman and Brox references "would not have been helpful in producing palatable fish oil capsules, and <u>in fact would have led an investigator away from the correct parameters (6% to 10% water).</u> (Baker Decl., Ex. H, p. 7 (underlining in original).)

Plaintiff also repeatedly asserted to the Examiner that the acceptable range of water soluble flavoring was 0.5% to 1.5% of the total weight of the gelatin capsule. Plaintiff represented that its palatable fish oil capsules required "a narrow range of flavoring concentrations," and that "palatability was improved in a very narrow range between 0.5% and 1.0%, and that at 1.5% flavoring concentration there was a harsh after-taste *and a very soft capsule*." (Baker Decl., Ex. H, pp. 6-7.) Plaintiff further represented that *"[t]he prior art did*



MCDERMOTT WILL & EMERY LLP ATTORNEYS AT LAW PALO ALTO

*not recognize the importance of these variables*" as a means to distinguish other flavored gelatin capsules. (*Id*. at p. 7.)

Consideration of all of the evidence – the claims, specification, and prosecution history – make it clear that Plaintiff cannot expand the scope of the claims beyond the specified concentration ranges. Nor can its claims cover flavored gelatin capsules in which the flavoring is not distributed throughout the gelatin capsule in the identified concentrations, such as capsules with coating or spray-on flavoring. Defendants' construction comports with the plain and ordinary meaning of the claim terms and should be adopted.

## V. THE SECONDARY CLAIM CONSTRUCTION DISPUTES

This Court need only construe those terms that are in controversy, and "only to the extent necessary to resolve that controversy." *Vivid Technologies, Inc. v. American Science & Engineering, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999). While the following terms are technically in dispute (*i.e.*, the parties did not agree to a stipulated construction), none of these construction disputes greatly affect the infringement, validity, or enforceability of the '231 and '879 patents that the parties have disclosed under the Patent Local Rules.

### A. GELATIN SOFTENER

This claim term is present in all of the asserted claims of both the '231 and '879 patents. (Baker Decl., Ex. A, col. 5, l. 19; Ex. B, col. 4, l. 37.) Defendants construe "gelatin softener" to mean a softener or plasticizer. Plaintiff's construction states: "'Gelatin Softener' also known in the industry as a 'plasticizer' means 'a compound used to make the gelatin capsule more flexible, specifically including glycerol, sorbitol and other polyols.'" The listing of the specific examples by Plaintiff is unnecessary to the claim.

### B. PALATABLE, PALATABILITY

"Palatable" is present in all of the asserted claims of the '231 patent; "palatability" is present in all of the asserted terms of the '879 patent. The plain and ordinary meaning of "palatable" is "acceptable to the taste," and of "palatability" is "the quality of acceptability to the taste." Plaintiff's proposed construction of "palatable" as "having a pleasant or acceptable taste" is an attempt to impose additional limitations into the claims that is

contradicted by the specification. (*See* Baker Decl., Ex. A, col. 1, ll. 20-30 (taste is purely subjective).) Moreover, Plaintiff has cited nothing in the intrinsic record or extrinsic evidence to support its proposed construction of this term.

The Court should construe "palatable" and "palatability" in accordance with their ordinary meaning, as proposed by Defendants.

### C. GELSWATCH

This term is found in only one of the asserted claims, Claim 16 of the '879 patent. Defendants construe "gelswatch" in accordance with its ordinary meaning and the prosecution history, *i.e.*, "a mixture of gelatin, gelatin softener, water and any additional components of the gelatin capsule shell." Join Claim Construction Statement (Docket No. 30), Ex. A at p. 6. For instance, the inventor's October 8, 2000, declaration included a document stating that "[t]he gel used for making the gelswatches consists of gelatin, glycerol and water." (Baker Decl., Ex. I (NOR 0000087).) In contrast, Plaintiff has provided no evidence, either intrinsic or extrinsic, that supports its proposed construction of "a mass of mixed shell ingredients ready for use in the encapsulation of the fill material, typically formed in sheets or ribbons."

## VI. CONCLUSION

For the reasons above, Defendants respectfully request that the Court adopt Defendants' constructions of the disputed claim terms.

DATED: February 4, 2008

MCDERMOTT WILL & EMERY LLP

By: */s/ William G. Gaede, III*
William G. Gaede, III

Attorneys for *J.R. Carlson Laboratories, Inc. and Metagenics, Inc.*