Pages 1 – 57

United States District Court

Northern District of California

Before The Honorable Phyllis J. Hamilton

```
Nordic Naturals,            )
Incorporated,               )
                            )
          Plaintiff:        )
                            )
    vs.                     )          No. C07–2385 PJH
                            )
J.R. Carlson Laboratories,  )
                            )
          Defendant.        )
_____)
```

San Francisco, California
Wednesday, April 30, 2008

**<u>Reporter's Transcript Of Proceedings</u>**

<u>**Appearances**</u>:


For Plaintiff:          Jones Day
                        1755 Embarcadero Road
                        Palo Alto, California 94303
                **By:  Behrooz Shariati, Esquire**
                     **James E. Glore, Esquire**


For Defendant:          McDermott, Will & Emery
                        3150 Porter Drive
                        Palo Alto, California  94304
                **By:  William G. Gaede, III, Esquire**


*Reported By:          Sahar McVickar, RPR, CSR No. 12963*
*                     Official Reporter, U.S. District Court*
*                     For the Northern District of California*

(Computerized Transcription By Eclipse)

```
 1    Wednesday, April 30, 2007                          9:00 a.m.

 2                         P R O C E E D I N G S

 3              THE CLERK:  Calling civil case 07-2385 Nordic

 4    Naturals versus J.R. Carlson Laboratories, et al.

 5              Appearances.

 6              MR. SHARIATI:  Good morning, Your Honor.

 7              Behrooz Shariati and James Glore from the firm of

 8    Jones Day on behalf of Nordic Naturals.

 9              THE COURT:  All right, good morning.

10              MR. GAEDE:  Good morning, Your Honor.

11              Bill Gaede, the law firm of McDermott Will & Emery,

12    on behalf of the defendants.

13              Also my colleagues Debra Bennett and Brian Baker

14    here.  And also, Paul Konney, who is the general counsel of

15    Metagenics.  And John Carlson and Carrie Carlson of Carlson

16    Laboratories.

17              THE COURT:  All right, good morning.

18              All right, this matter is on for a Markman hearing.

19    We have roughly two hours; the time will be divide equally

20    between you, about an hour each.  What I'd like to do is to go

21    through -- the patent holder will go first -- go through each

22    of the disputed terms one at a time.  Instead of having an

23    entire presentation by one side, we'll do them in order.

24              I did think that the defendant's, even though my

25    standing order does require that you address them in the same
```

```
 1    order as in the claim construction statement, the defendant's
 2    did make a little more sense because there are the two claims,
 3    two terms that are the key terms that we probably do want to do
 4    first.  So we'll take them in the order in which the defense
 5    raised them in their papers, meaning that we start first with
 6    water soluble flavoring.
 7              MR. SHARIATI:  Okay.
 8              Your Honor, and may it please the Court, I have a
 9    little bit of introduction, if the Court would like me to skip
10    over it, we can skip over it.
11              THE COURT:  Well, just don't tell me about general
12    patent principles.  Any other introduction would be fine.
13              MR. SHARIATI:  Okay, fine.
14              Just very briefly, just a quick recap of the
15    technology, which this is, regarding Omega 3 and fish oil,
16    which are beneficial supplements.  The problem in the past has
17    been that the taste and the smell of fish oil has been a
18    deterrent to individuals from taking them.  And the patent --
19    the two patents teach a soft gel capsule that have specific
20    amounts of water, specific amounts of flavoring that were
21    determined to be the optimal based on experimentation.  And the
22    goal of the patents is to improve the palatability of the fish
23    oil soft gel.
24              There is one specific embodiment shown in the
25    specification, obviously, the best embodiment that the inventor
```

1    was aware of at the time, which involved mixing in the flavor

2    with the soft gel.  We contend that this is one of the issues

3    that the Court will address.  And, it was raised in the papers.

4    We addressed it's not just one specific embodiment, that it's

5    not limiting to the scope of the claims, but we will address

6    those as the time comes.

7            The other aspect of it, to keep in mind as we are

8    going through the presentations, is that the -- as our

9    declaration of our expert, Dr. Elder, pointed out, these soft

10   gel capsules are essentially dynamic in nature.  You can't --

11   things that are put on them go inside of them.  Things are

12   always moving around.  It's not a piece of clay where you put

13   something on it and it stays there.  There is always movement

14   of material within the gel itself.  So that's, you know, our --

15   in our expert's declaration, paragraphs 13 and 14.

16           **THE COURT:**  Okay.

17           **MR. SHARIATI:**  So, skip the -- skip the overview,

18   the claim construction, and go right to the water soluble

19   flavoring.

20           So, the water soluble flavoring is an element in

21   claims 1 through 4 and 16 of the '231 patent and claims 1, 3,

22   and 6 of the '879 patent.  The water soluble part of it is --

23   we are essentially in agreement.  We say that the water soluble

24   is a substance that is easily dissolvable, especially in water,

25   I mean, or words to that effect.  The defendant uses different

 1    words, "susceptible to being dissolved in water," but, on that

 2    aspect I think there is not much dispute.

 3             **MR. GAEDE:**  Your Honor, I can tell you in terms of

 4    the language, "easily dissolvable," that is fine with us.

 5             **THE COURT:**  All right, thank you.

 6             **MR. SHARIATI:**  So already making progress, Your

 7    Honor.

 8             **THE COURT:**  Good.

 9             **MR. SHARIATI:**  The dispute, to really cut to the

10    heart of it, Your Honor, the dispute is in two places,

11    primarily.  One is what is a flavor?  We contend it's a

12    substance or material used to alter the natural flavor of

13    another substance.

14             Now, the "as opposed to sweetness" is put in there

15    because defendants are trying to enlarge "flavor" to include

16    anything that adds sweetness to a food.  So, sugar to them is a

17    flavor.  And we -- and that's inconsistent and is essentially

18    both the intrinsic and the extrinsic evidence goes completely

19    the other way on that.  So, we put that in just to make clear

20    to a jury hearing this case that we are not talking about sugar

21    or sucrose, we are talking about flavor, such as you would see

22    if you walked into Baskin Robbins, and all the ice creams are

23    there; there is strawberry, there is lemon, there is peanut

24    butter, all the other.  Those are flavors.  There is no

25    sugar-flavored ice cream that I've ever seen.

1             **THE COURT:**  Although I'm sure all ice cream has

2 sugar.

3             **MR. SHARIATI:**  Indeed.  And that is exactly the

4 point, Your Honor, sugar is a component of some of these

5 flavors, to be sure, but the flavor is something more complex

6 than that, it's a taste of some other substance, some other

7 food, such as strawberry, that is imparted to something else.

8 So sugar alone cannot be a flavor.  And we'll see that in both

9 the intrinsic and the extrinsic evidence.

10             The other dispute is this idea that the flavor has

11 to be present throughout the gelatin capsule shell in the

12 concentration specified by the claims throughout the shell.

13 This is -- this dispute relates to essentially --

14             **THE COURT:**  I don't really understand what that

15 means --

16             **MR. SHARIATI:**  Uh-huh.

17             **THE COURT:**  -- at all.  "Throughout the capsule";

18 does it mean that every little tiny bit of the shell must have

19 the same amount of the flavor in it?

20             **MR. SHARIATI:**  That's how we read it, Your Honor.

21             **THE COURT:**  Is that similar to -- I'm just trying to

22 put it in terms that I can understand.

23             If you have a piece of chocolate cake --

24             **MR. SHARIATI:**  Yes, Your Honor.

25             **THE COURT:**  Is the argument that every bite of cake

1    has to have the same bit, amount of cocoa in each bite?

2              *MR. SHARIATI:* I --

3              *THE COURT:* As opposed to the cup of cocoa there

4    might be in this bite a whole teaspoonful but in the next bite

5    only some fraction of that?

6              *MR. SHARIATI:* Well, the plaintiff's position is

7    once you put in the half a cup of cocoa in the cake, wherever

8    it goes it's in the cake.

9              *THE COURT:* Well, aren't the general capsules all

10   made the same way?  Aren't they made by mixing all the

11   ingredients together in their liquid form, and then they are

12   formed into sheets?

13             *MR. SHARIATI:* They are not.  And therein lies the

14   dispute.

15             *THE COURT:* Okay.

16             *MR. SHARIATI:* This is really a dispute about the

17   method of manufacturing the gels.  And the Court has really

18   gone right to the heart of the matter.

19             The preferred embodiment in the patent describes

20   exactly what you just described; you mix in everything, you

21   make a sheet, you know, let it cool, et cetera.

22             Things have evolved since then, and there are other

23   ways of doing the same thing.  What happens now in some

24   instances is that the gel is made, the gel cap is made without

25   any flavor in it, and then some flavoring is sprayed on top of

1    it, on top of the finished capsule, I think we discussed that

2    before.

3            And so the flavoring is not a -- is not -- so this

4    is like your cake analogy, Your Honor, the chocolate is not

5    baked into the cake, but it's sprayed over it afterwards.

6            The defendants are putting this limitation in to

7    essentially limit the invention to the preferred embodiment to

8    the old way of just cooking everything in.  And, it actually

9    even goes beyond that, in our view.  You know, just because you

10   mix everything in, as the Court just pointed out, there is no

11   guarantee that everything goes throughout.  The cocoa could be

12   in one corner or some other corner of the cake.

13           So --so this is a limitation even beyond what the

14   specification requires -- the specification teaches -- that the

15   defendants are trying to put in to avoid infringement.  And it

16   is our position that it doesn't really matter if you bake the

17   flavor in or spray the flavor on, because this really wasn't

18   the issue when the patent was being prosecuted, the issue was

19   the ratios.  And if you get the right ratio, whether you spray

20   it on or put it in, it's still practices this patent.  So this

21   is what this dispute is about.

22           You look puzzled, Your Honor.

23           **THE COURT:**  Well, I just didn't understand that from

24   the papers.

25           The dispute is, in practical terms, is about whether

1   or not the capsule can be dipped in or sprayed.

2             *MR. SHARIATI:*  Exactly, Your Honor.

3             *THE COURT:*  As opposed to having it mixed in.

4             *MR. SHARIATI:*  Yes, Your Honor.

5             *THE COURT:*  That is really the disputed --

6             *MR. SHARIATI:*  That's really what this fight is

7   about.

8         And, you know, obviously the -- we -- the plaintiff

9   contends that the invention is much broader than the spec --

10   than the preferred embodiment.  And defendants, naturally, are

11   trying to narrow it down.

12         The -- but the practical impact of using one method

13   versus the other is essentially the same; if you take two

14   products that are made with these two methods, you know, and if

15   you take the product with the flavor baked in and you get the

16   product with the flavor sprayed on, they are essentially the

17   same.  You can't really tell the difference from the products

18   themselves.  And so, I mean, that's really our point.

19             *THE COURT:*  Well, I'm not sure I understand from the

20   language that you used, or I guess this is more a question to

21   the defendant, I don't understand how that covers the spray in.

22             *MR. SHARIATI:*  Which doesn't?

23             *THE COURT:*  The spray on present throughout the

24   gelatin capsule in concentration specified by the claims.

25             *MR. SHARIATI:*  It doesn't, Your Honor.  And that's

1    the point, they want to avoid infringing, so that's their

2    argument that because they are grafted this limitation on here

3    to this claim, to this element, that once -- once that required

4    -- if the Court adopts that requirement, then if -- if -- if

5    their method is spraying the flavor on, they can argue --

6           **THE COURT:**  Okay, all right, so then you should

7    point me to the portions of the record that you believe support

8    your broad --

9           **MR. SHARIATI:**  And, I intend to do that, Your Honor.

10          This patent, this patent was a very hard -- was --

11   getting this patent to the Patent Office, especially the first

12   one, the '231, was kind of a slog, it wasn't easy.  There was a

13   lot of final rejections and interviews with the examiner, and

14   all that stuff.  And if you look at -- if you look at this

15   record, and I think some of the stuff is in the record, there

16   was never a point where the inventor said to the Patent Office

17   you should grant this patent because we bake the flavor in.

18          They always said what's critical about this patent

19   is the ratios.  Every single interview record, every single

20   paper in the file history says what's important about this

21   patent is the ratio of water, the ratio of flavor.  And, for

22   example, and you can see this, this is an exhibit that was

23   filed, this is an exhibit filed by the defendants as the

24   request for judicial notice.  And Exhibit C to that request is

25   a -- is a office action that includes a notice of allowance.

1    And I have copies.  And if I may read this into the record?

2            This is from the examiner finally relenting and

3    allowing the patent to issue --

4            **THE COURT:**  All right, what's the exhibit, again?

5            **MR. SHARIATI:**  Exhibit C, Your Honor, to the request

6    for judicial notice.

7            **THE COURT:**  Okay.

8            **MR. SHARIATI:**  And I have copies.

9                    **(Handing forward copies.)**

10           **MR. SHARIATI:**  Those are two copies.

11           If you look at page 4, Your Honor, under "Allowable

12   Subject Matter," it says, "The following is an examiner's

13   statement for reasons of allowance.  The closest prior art does

14   not teach the concentration of the flavoring in the capsule in

15   the amount ranging from 0.5 percent to 1.5 percent,"

16   concentration, not baking it in.

17           And then in the second patent, the '879 patent, and

18   this -- there is a similar reason for allowance in the case of

19   that patent; which, unfortunately, this document is not in the

20   record, but I will move to allow -- to augment the record to

21   add this in after the hearing, with the Court's permission,

22   it's a notice of allowance for the '879 patent, the second

23   patent in this case.

24           Same exact examiner says almost exactly the same

25   thing.  It says, "The following is an examiner's statement of

 1   reasons for allowance.  The closest prior art does not teach a

 2   flavored gelatin capsule for encapsulating a dose.  And the

 3   gelatin capsule itself comprises a flavoring agent and water,

 4   wherein the concentration of the flavoring agent is the amount

 5   ranging from 0.25 percent and 1 and a half percent and water

 6   between about 6 and about 10 percent."  Again, concentration is

 7   what matters, not baking it in.

 8            So what -- what the defendants are arguing here is

 9   that the word "in" doesn't mean -- should mean that literally

10   that it's inside the capsule, you know, that "on" is not good

11   enough, sprayed on, and so on.  So -- so that's -- that's that

12   aspects of the -- that's that aspect of the -- of the dispute.

13            Let me -- let me, if the Court would not -- would

14   indulge me, I want to talk about the sugar side a little bit

15   first to get that out of the way.

16            So the specification in the claims will talk about

17   flavoring.  They don't talk about sweetening, they talk about

18   flavor.  And they use that flavor in the broadest sense.  And

19   looking at a dictionary in the permissible way that ***Philips***

20   allows us to do -- the Federal Circuit allows us in ***Philips*** --

21   is we find that consistently we have the "flavoring is a

22   substance that imparts flavor," not particularly surprising.

23            So and this specification teaches us, gives us some

24   examples of what a flavor is in the context of this patent.

25   And it is, as we can see, berry, strawberry, and I'm not going

```
 1   to read the whole list, but, you know, there a long list of

 2   various things, and sugar is not among them.  It's all more

 3   complex flavors than just, than just sugar.

 4          THE COURT:  But some of the flavors are sweet

 5   flavors as opposed to savory flavors.

 6          MR. SHARIATI:  They are, indeed, Your Honor.  But

 7   again, it's not -- it's not pure sugar that you are talking

 8   about.

 9          THE COURT:  And when the industry uses sugar or

10   sweetener, are you referring specifically to Sorbitol and other

11   kinds of sweeteners?

12          MR. SHARIATI:  In fact, Your Honor --

13          THE COURT:  I mean, would it include the naturally

14   occurring fructose in fruit?

15          MR. SHARIATI:  I'm not an expert in that, Your

16   Honor, but if you look at -- if you look at some of the

17   extrinsic evidence that that could clarify that.

18          Fructose, I think by itself, I think shows up as a

19   sweetener and not as a flavorant.  And so this is one example

20   of a -- of a reference in the field.  And you have the

21   flavorants listed there, and you have the sweeteners.  And I

22   think there is no fructose, but, you know, you have dextrose

23   and glycerin and Mannitol.  So these are considered separate

24   categories by this reference.

25          THE COURT:  Now, are you showing these extrinsic
```

1   reference because you agree that the intrinsic evidence, the

2   claims in the specifications, don't really provide any guidance

3   as to how to interpret sweetener?

4           **MR. SHARIATI:**  I do not, Your Honor.

5           **THE COURT:**  Okay.

6           **MR. SHARIATI:**  I'm saying that the intrinsic

7   evidence -- first, we look at the words of the claim.

8           **THE COURT:**  In other words, my question is can't

9   this be decided by looking at the intrinsic evidence?  Why are

10  we looking at it?

11          **MR. SHARIATI:**  Well, okay, it can be.  I just wanted

12  to re-enforce the intrinsic evidence.  I think the intrinsic

13  evidence is quite clear, actually.  The specification lists

14  these various, berry, strawberry, chocolate, and so on.

15          **THE COURT:**  Those are just examples.

16          **MR. SHARIATI:**  Examples.

17          Claim 1 of the -- claim 1 claims flavor.  Claims 3,

18  which is a dependent claim, has the similar list, so it narrows

19  the scope of claim 1 and it gives us examples of what flavors

20  is.

21          The patent itself in the specification talks about

22  adding softeners to the gelatin, this is part of the -- part of

23  the recipe.  And as -- some of the softeners such as Sorbitol

24  and glycerin are actually sweeteners.  So the patent does

25  disclose that even though you could add softeners that are

1    inherently sweet, you still need to add flavoring.  The

2    flavoring is a separate category in the patent.

3            So the intrinsic evidence is, you know, just looking

4    at the intrinsic evidence, we can see that sweeteners are

5    treated separately.  And even though the patent acknowledges

6    that some of the softeners could be sweet and could act as

7    sweeteners, nevertheless, you have to add flavors as well.  So

8    again, intrinsic evidence.  And then, we have a whole slew of

9    extrinsic evidence that we cited in the papers that confirms

10   this.

11           This is not a -- if there were any doubt in the

12   patent of the intrinsic evidence, the extrinsic evidence, some

13   of it is cited by defendants, who are proponents of this

14   theory, in fact, support our position that sweeteners are one

15   category of additives and flavors are something else, and the

16   two are quite different from each other.

17           So, you know, the response that they have in the

18   slide you will see is, you know, if you put sugar in your

19   coffee, doesn't it change the flavor?  And I would submit -- I

20   don't know if Your Honor is a coffee drinker or not, but if you

21   put sugar in your coffee, you just get sweet coffee.  It still

22   tastes like coffee.  If you want flavored coffee, you can get

23   coffee that taste like amaretto or hazelnut, or one of these

24   other flavors they add to it.  That is a different -- different

25   experience.

1            And again, they're -- the other question that they

2      are going to ask, Your Honor, is that if you take the sugar out

3      of lemonade does the flavor change?  I would say, you know, no,

4      it still tastes like lemonade, just with a lot less sugar.

5      But, you know, the taste of lemonade, the flavor of lemonade

6      requires the lemon, not the sugar.

7            So, both in daily experience and the ordinary

8      meaning of the word, flavor, plus all these examples from the

9      patent where the flavoring and sweeteners are treated

10     separately, and again, the, you know, the extrinsic evidence

11     that supports all this, our position is that sweetener is

12     sweetener, flavor is flavor and the two are separate, that you

13     can't substitute sweetener for a flavor.

14           So, going back to -- do you want that point rebutted

15     or discussed, or should I go on?

16           **THE COURT:**  Are you finished with water soluble

17     flavoring?

18           **MR. SHARIATI:**  I'm finished with water soluble

19     flavoring, the sweetener aspect of it.  I'm not finished with

20     the --

21           **THE COURT:**  Yeah, do the other part.

22           **MR. SHARIATI:**  Okay.  Let me skip forward through

23     this real quick.

24           Okay, so -- so the other issue we have, the other

25     quarrel we have with defendant's construction, and it starts on

```
1   Slide 39 of the handout, Your Honor, if you are keeping score

2   on the bench, they bring in this -- they bring in this present

3   throughout, which we discussed a little bit earlier this

4   morning.  The -- their logic seems to be that the preferred

5   embodiment is talking about mixing the flavor in with -- in the

6   batch and cooking the gelatin.  So, if you limit -- if you

7   limit the invention to that one embodiment, you then should

8   make the next inference, next leap from there and say, because

9   everything is mixed together, it's present throughout the

10  capsule.  There are a couple of problems with that.

11          First of all, as **_Phillips_** -- the Federal Circuit has

12  told us in **_Phillips_**, it's not permissible, generally, to limit

13  the invention to the preferred embodiment.  You know, the

14  invention is always generally broader than that.  There is some

15  exceptions to that, but they don't apply here.  But if the

16  inventor discloses one embodiment, the invention's -- the

17  claimed invention's is broader than that.

18          And then, but even if you -- even if you just look

19  at the preferred embodiment, there is nowhere in the patent

20  that says and the flavoring has to be present throughout the

21  capsule.  There is no such statement.  There is no such -- you

22  have to make an additional leap from there saying that this is

23  a uniform mixture, and the flavor goes everywhere, the cocoa is

24  everywhere in the cake.  We don't know that.

25          And, in fact, the evidence we have, the testimony of
```

1    our expert says this is a dynamic environment, things move

2    around because of the water.  Things that come into the water,

3    go out of the water, so it's not really possible to determine

4    or require that the flavoring be everywhere.

5            And, as the Court already pointed out this morning,

6    it's kind of an absurd proposition that you have to test every

7    single piece of the capsule to see if, you know, is the flavor

8    here?  Is the flavor here?  Is the flavor here?  That is just

9    not -- that is not required.  The patent doesn't require that,

10   and there is nothing in the file history that requires that.

11           The patent -- the wherein clauses of the patent only

12   talk about the concentration.  I mean, these are in different

13   claims, but it talks about the concentration about .5 percent

14   and 1.5 percent.  And all it's required is that this

15   concentration be present in the gelatin capsule.  It doesn't

16   say how it should get there.  There is no -- you know, there is

17   one method claim that says, okay, you bake -- you do it this

18   way.  But all the other ones are apparatus claims or

19   composition of matter claims.  They just care about the

20   particular final concentration of the ingredients in the final

21   product.

22           And there is really no justification to read in --

23   to read in the additional limitation.  So the best -- the best

24   we can tell, I mean, the prior art on this patent, as, you

25   know, it's -- it explicitly states, the prior art was to flavor

1    the fill, not the gelatin, the oil.

2            So when the patent claims talk about the flavoring

3    in the shell, they are talking about not in the oil.  They are

4    distinguishing the prior art that -- where the flavoring was

5    actually added to the oil, not to the -- not to the capsule.

6    It doesn't -- it's not required, and it doesn't say that it has

7    to be all over the capsule.  I mean, as the Court probably

8    knows from daily experience, the only part of the capsule that

9    actually is tasted is the part on the outside which has contact

10   with the tongue.  Unless someone, say, would chew on a tablet

11   for some reason, the only part of the flavor that really

12   matters is what is on the outside.  So, this requirement

13   doesn't even make any sense because what's on the inside of the

14   capsule would not affect or improve the palatability of the

15   capsule.

16           So, all this means is that all that is required by

17   the claims is this -- these particular concentrations.  That is

18   exactly what the patent -- the inventor argued in front of the

19   Patent Office.  They said you have to have these particular

20   concentrations to overcome to prior art.

21           And I showed you -- I showed the Court the notice of

22   allowance, and that's what the examiner -- that was the basis

23   of the allowance, not that the -- not some sort of uniform

24   distribution of the flavoring in the capsule.

25           What -- what the defendants point to in the file

1   history are a couple of responses to office actions where --

2   and also experimental, some of the experimental documents that

3   talk about the amount of water in the capsule.  I mean, if you

4   read -- if you read what they show you and you read before and

5   after, the inventor is saying if you put too little water in

6   the capsule, the capsule will dry up and it wouldn't taste

7   right.

8         And, they are really talking about water, they are

9   not talking about the flavor being present throughout.  And

10  this is in both the -- you know, when they are doing the

11  experimental -- the experimental record as well as the argument

12  where they are distinguishing products.  One of the prior

13  references is it only has 3 percent of water in it.

14        So, what the plaintiff -- I'm sorry, what the

15  defendants are hanging their hat on here is statements made by

16  the inventor about something entirely different, it's about the

17  concentration of water.  And this is really consistent through

18  the -- through the file history, that it's the concentration of

19  the water, the concentration of the flavoring that really

20  matters.  And that's what's being claimed.

21            **THE COURT:**  Okay, thank you.

22            Other side?

23        **MR. GAEDE:**  Let me focus first on the "throughout

24  the gelatin capsule."  And perhaps if that is causing the Court

25  a concern, what we are really referring to is that it's mixed,

1  combined throughout the gelatin of the capsule shell.  That's

2  what that's intended to mean, similar to the way a cake is made

3  where the ingredients are mixed together and they form the

4  cake.

5          But the argument of plaintiff here is in essence

6  that I make an angel food cake, I put chocolate frosting on the

7  outside of the cake, and somehow that means I've transformed

8  that angel food cake into a devil's food cake.  And that simply

9  is not described anywhere in the specification, in the claim

10 language, in the intrinsic and dispositive prosecution history,

11 as well as the fact that they avowed to the world that these

12 claims were limited to the preferred embodiment.

13         So let me go through the intrinsic record because no

14 one's trying to read in a claim.  What's going on here is the

15 inventor is trying to claim something that the inventor never

16 invented.  And let me start out first by a comment that

17 Mr. Shariati made, that putting coatings on the outside of

18 capsules was not in the art.  That is simply not true.

19         His own papers submitted an article which was

20 published in the 1980s, and that patent application was filed

21 in 1999.  If we just go right here, this was part of extrinsic

22 evidence that they submitted as part of the record.  And it

23 says right here, 1985, "The use of chocolate and coatings can

24 improve palatability" that's in a Japanese patent, "coatings

25 based on polysaccharides possibly" --

1          **THE COURT:**  You're reading it too fast for the

2     reporter.

3          **MR. GAEDE:**  Okay, I'm sorry.  I'm sorry.

4          -- were applied onto soft gels to improve taste."

5          So the notion that coatings onto soft gels that were

6     being applied to improve taste was not known in the art is just

7     simply wrong, and their own papers prove it.  And that's

8     important because the conversation that was occurring between

9     the examiner and the inventor here, was based on what was

10    described in the claims and in the specification and the

11    representations that were being made in the prosecution

12    history.

13         It's noteworthy that nowhere do the plaintiffs

14    provide any citation to any disclosure, in this specification,

15    that covers the range of embodiments that makes clear what they

16    are now claiming.

17         So, and I think you have to start with the plain

18    language of the claim.  The claim itself says where -- and by

19    the way, I think this is an important point:  They have agreed

20    and we agree that the water and the water soluble flavoring,

21    because it's the same language, in essence, must be construed

22    the same way, use the same terminology.  So water is present

23    "in said gelatin capsule," not on, not around, not in part of,

24    but in said gelatin capsule.

25         And that's also likewise the same for the water

1    soluble flavoring.  And they use the word "concentration," and

2    concentration further describes the distribution in a

3    particular volume; in other words, you don't have in one

4    section of the capsule take 6 to 10 percent concentration of

5    water, and then, say over here, in another part, let's say one

6    part of the capsule we have 20 percent water, the other part we

7    have zero, and, on balance, the whole capsule, the gelatin, has

8    6 to 10 percent.  That is not the ordinary use of the term in

9    and concentration.

10           Now, but, it's very clear when you read their papers

11   and, particularly with their reply brief, that the scope that

12   they are going for is very broad.  So they use terms like

13   "plaintiffs proffered construction simply requires a range of

14   percentages to be present anywhere in the capsule."  Or,

15   coating is part of the manufacturing, or that the proper

16   materials are present in the proper proportions because layers

17   or sections of materials; none of this, there is not one word

18   that they point to in that specification or in the claim

19   language that describes all of that.  And so, what they're

20   essentially saying is that all of these are encompassed by the

21   words water soluble flavoring present in said gelatin.  This is

22   number 7.

23           And remember, Your Honor, they also agree that water

24   and water soluble flavoring must be construed consistently.  So

25   what they are also saying to you is that water, then,

1    necessarily could be employed in all of these ways because

2    that's the thrust of their argument.  So now, we have a shell

3    with water on the outside?  That makes no sense.  We have water

4    in portions?  That makes no sense.

5              And I won't get into, you know, the language from

6    the case law, but certainly I think the *Gentry Gallery* case is

7    important because it stands for the proposition that you can't

8    broaden claims in supporting a disclosure.  It's not a

9    question, necessarily, of preferred embodiment, it's a question

10   of disclosure.

11             What is this invention?  We can make things up after

12   the fact to try to ensnare defendants, but what did this

13   inventor, when he sat down in 1998 and 1999, what did he

14   allegedly invent?  And when he put pen to paper, what did he

15   describe to the world?

16             Plaintiff is undermining the public notice function

17   of the intrinsic record through their broad -- if they really

18   meant to claim this, why didn't they just use the words in the

19   claims?  Why not just say on top of the capsule or coating the

20   capsule?  Why didn't they just say in sections or layers?  Why

21   didn't they just say in some portion of the capsule?  These are

22   all words they have used to you in their opening and their

23   reply brief.  But the patentee, when it came time to making

24   representations to the Patent Office and describing their

25   invention, made no such claims.

1           And, I think, critical to understanding this issue

2    is claim 16.  Now, they say, well, we're not limited to the

3    methods; well, but I think you've got to look at the method

4    claim that is -- that is claim 16.  And this is Slide No. 10.

5    This is the only process for making these gelatin capsule

6    shells that are described in the specification.  I don't think

7    you are going to get any disagreement on that point from the

8    plaintiff.  And this claim captures it.  And it's very

9    important that we focus on what it says.

10          It says in B, it says "melting and mixing said

11   gelatin, said gelatin, said gelatin softener, said water, and

12   said water soluble flavoring."  So you've got to mix it.  Melt

13   it and mix it together; as you learned in the tutorial, that is

14   what you do to make the gelswatch.  It goes into the machine --

15          **MR. SHARIATI:**  Your Honor, I'm sure this was

16   accidental, but I understand that the tutorial was not

17   citeable.  And this was probably a slip, but I just want to

18   make sure that --

19          **THE COURT:**  Well, that kind of reference is fine.

20          **MR. GAEDE:**  All right.

21          And then you form the gel capsule, and then, this is

22   I think very critical: lOok at the last step. So what we've

23   talked about in this claim 16 is taking the mixture, and now

24   what do we describe that mixture after we've dried it?  We've

25   said it's a water concentration in said gelatin capsule which

1    is between about 6 percent and about 10 percent.  That's

2    essentially the same language that's used in composition

3    claims.  And you can't construe it one way for purposes of the

4    method claim and another way for purposes of composition

5    claims, which is exactly the net effect of their position.

6    They agree that the water -- that the water and the water

7    soluble must be construed the same way.  They agree with that.

8    And they further -- in this claim right here, it uses the same

9    language.  Likewise, water soluble flavoring concentration in

10   said gelatin capsule.  It doesn't have a range, but it uses,

11   again, water soluble flavoring concentration in said gelatin

12   capsule.  So they are essentially asking you to construe terms

13   in a different way.  And claim 16 disproves, the intrinsic

14   record disproves their argument.

15          And again, you can see in '231, claim 1, again, in

16   composition you have the general:  "Said water is present in

17   said gelatin capsule."

18          Again, there is no disclosure on the specification,

19   nothing about coatings.  It talks about the gelswatch

20   ingredients being mixed and combined.  But, let's take a look

21   at what they said to the PTO and what they told the public.

22          I think this statement right here is probably the

23   best one.  There is four or five more there.  They are in your

24   slides there at 16 through approximately 20.  You've got

25   statement after statement in the prosecution history, but what

1  they are focusing on here is that water solubility is important

2  for obtaining an even distribution of the flavoring in the

3  gelswatch.  And they are not talking about you can flavor a

4  portion of the gelswatch or you can coat the gelswatch, but

5  that the water soluble flavoring is important for that

6  distribution.  It's mixed; it's mixed throughout.

7          Now, they have an expert comes in, in a reply, and

8  says, well, this a dynamic nature; whatever that expert is now

9  saying to this court, this is what the inventor told the Patent

10  Office.  And that is dispositive, and that governs how to read

11  this intrinsic record so that the public has notice of the

12  scope of the claims.  And, they can't come in on a reply

13  declaration after the fact and attempt to override the

14  representations made by the inventor to the Patent Office and

15  to the public.

16          And what we found here, the statements, again, by

17  the inventor:  "Capsules are unpleasant to the taste because

18  the flavor was not evenly distributed in the capsule."  And

19  this is a statement that he made with some embodiment that

20  failed because there wasn't a distribution throughout the

21  gelatin capsule; in other words, it wasn't mixed.

22          Same thing, we've got, again, flavoring in the

23  gelatin capsule shells at 20.  And we know, because that is

24  what they have told the Patent Office, that uneven distribution

25  can cause problems.  We know that uneven distribution causes

 1   problems.  It can cause cracking, decay, shape distortion.

 2   Oxygen seeps in, spoiling the fill.  You need that distribution

 3   of water and water soluble flavoring.

 4          But, I think if there's any final piece of proof

 5   that clinches the argument and clinches the correctness in

 6   light of all the intrinsic evidence, it's about what I'm about

 7   to show you.  They say in their reply brief that we are

 8   focusing on just the preferred embodiments, that's what they

 9   say.  Now, as I've a shown you with claim 16, with the entire

10   specification, with the language itself of the claim and what's

11   in the prosecution history, I disagree, but Amendment B, which

12   is in your papers, what happened here?  They were facing a

13   prior art rejection, and they canceled all the pending claims,

14   1 through 24, and they added in a whole new claim set.

15          And here, at Slide 23, they say right here, "The

16   invention now expressly claims particular critical ranges of

17   flavoring concentrations corresponding to the preferred

18   embodiments in the application."  They are telling the world

19   that these claims that they are now introducing into

20   prosecution correspond to the preferred embodiments in the

21   specification.

22          **THE COURT:**  It's simply says the ranges of flavoring

23   concentrations.

24          **MR. GAEDE:**  Corresponding to the preferred

25   embodiments.  And when you go read in the specification the

```
 1   section of the detailed description of the preferred

 2   embodiments that is described --

 3            THE COURT:  What -- point me to the column.

 4            MR. GAEDE:  Sure.

 5            THE COURT:  I have the patent right here.

 6            MR. GAEDE:  If you look at column -- it starts at

 7   the very bottom of column 2, line 64, where it says "Detailed

 8   Description of the Preferred Embodiments."

 9            THE COURT:  Are you looking at the '231 or the --

10            MR. GAEDE:  '231.

11            THE COURT:  Okay, column 2.

12            MR. GAEDE:  The very bottom there.

13            THE COURT:  Okay.

14            MR. GAEDE:  And you'll see, "Here's what follows:  A

15   detailed description of the preferred embodiments."  And you

16   turn over and you go to the next page where you have the

17   description of the preferred embodiments, and when you read

18   this section and the preferred embodiments that correspond,

19   when it talks about the ranges that are in there, in every

20   example, the preferred embodiments it described, it's a mixing

21   of the gelswatch or a combining of the ingredients together.

22   They are tying their claims to the preferred embodiments.

23            THE COURT:  Okay.

24            MR. GAEDE:  So there at column 3, line 11, it talks

25   about the manufacturing process, the preferred embodiment.
```

1    Again, 27, it talks about maybe part of the gelswatch mixture.

2    And so you go down this, and what you are getting is a

3    combining to get these critical ranges.  And that's what they

4    told the Patent Office that they were doing.

5              And so, just to complete the record here on this,

6    they had originally claimed 25, and then they had claimed 28,

7    which has the concentration.  And that's when they said they

8    made reference to claim 28 before.  Twenty-five is ultimately

9    -- they dropped it because it was not allowed by the examiner.

10   And then, they amended 28 to combine 25 and 28 together.  And

11   that's what Slide 25 shows.

12             And this is in Amendment No. C.  They still haven't

13   said it's not covered in the preferred embodiments.  And they

14   amended it, and now that's claim 1 of the '231 patent.

15             And so, what you have -- and they dropped, 25, 26

16   and 27.

17             And so, what you have is not only express statements

18   that the flavoring and the water must be mixed and distributed

19   throughout the gelatin capsule, in the prosecution history, you

20   also have an express tying of the actually issued claims to the

21   preferred embodiments that are described in the specification.

22             And just one other point which, I think, highlights

23   the lack of coherency in the argument that they are making that

24   these words mean these things.  They say that it can be a

25   coating on the outside of the shell, that there are deep -- but

1    there is no words that expressly limit it to just a coating.

2    As they use words, it can be a coating, it can be portions, it

3    can be sections, it can be layers.  It can be all these things

4    that are described in their -- allegedly in their composition

5    claim and covered by those words.  I disagree with that.

6            If you think about it, if it's on the outside of the

7    shell, why couldn't flavoring inside the shell then be the same

8    thing?  It can be outside the shell, or it can be inside the

9    shell.  Either way, you have a coating of the gelatin capsule.

10           But, we know that there are dependent claims that

11   have flavoring in the oil, which means it coats the inside of

12   the gelatin capsule because the oil, the fish oil is inside and

13   it's flavored, so it's necessarily coating the inside of the

14   gelatin capsule.

15           And they are rendering these dependent limitations

16   redundant by their broader interpretation or construction of

17   the independent claims because, necessarily, if you have flavor

18   -- if you claim that there could be a coating of some kind in

19   the independent claim, you necessarily have claimed that there

20   could also be flavoring inside the fish oil capsule that coats.

21           So, at the end you have the claim language, claim

22   16; you have the specification; you have the statements in the

23   prosecution history, both in terms of scope, and then also in

24   terms of tying it to the preferred embodiments.  All of that is

25   the intrinsic record that is what this -- that describes this

1  invention and provides notice to the public of what they can

2  do.

3          And, yes, our clients spray, not water soluble but

4  oil soluble, they spray it on the outside of the shell.  And

5  they are entitled to do that.  They are absolutely entitled to

6  do that.  That was in the prior art, as I showed you.  And

7  nothing in this intrinsic record supports the very broad

8  interpretation that plaintiffs perform or argue for.

9          Let me get the flavoring real quick.

10          I think there is a simple way to cut through this,

11  and I think the simple way to cut through it is, again, to stay

12  tethered to the intrinsic record.  And it's true, you can find

13  all sorts of things in the extrinsic about flavorants,

14  flavoring agents, sweeteners, whatever it might be.  But very

15  clearly, the specification, when it uses the word "flavoring"

16  and it gives some examples, uses the word to include, those are

17  word of exemplification, not words of limitation, in the

18  specification that Mr. Shariati relies upon.  So it can be

19  broader than that.

20          But, again, when it came time to tell the Patent

21  Office and the public what their invention was, and I'll skip

22  past the cream and the sugar and the lemonade, I believe it's

23  pretty clear, and that taste is one of your sensations, one of

24  the five taste sensations that exist, so, of course, that's

25  part of the flavor, but this right here, this statement in the

1   prosecution history, this statement in the prosecution history,

2   still it seams to include mixing flavorants. He does not

3   anticipate adding flavorants or sweeting agents to the gelatin

4   capsules, which is a key point not just in the dependent

5   claims, but in all of the claims.  A key point in all of the

6   claims, that's what they told the world.

7           And they use the word "or" here for a very important

8   reason, because in the dependent claims where they list some

9   flavorings expressly, yeah, those might be flavorants as

10  compared to sweetening agents.  So you have, for example,

11  chocolate flavor, or you have in one of the dependent claims

12  lemon or almond, and those are flavorants.  But, it says also

13  "or sweeten agents to the gelatin capsules."  That is a key

14  point in all the claims, and that is because of the word

15  "flavoring," not flavorants, not sweeteners, not taste

16  modifiers, by flavoring is the word.  And flavoring is tied to

17  taste, affects taste.

18          **THE COURT:**  And your position is flavoring as

19  opposed to flavorant includes both a flavor --

20          **MR. GAEDE:**  Absolutely.

21          **THE COURT:**  -- and sweetener.

22          **MR. GAEDE:**  Absolutely.  And there is support for

23  that in the extrinsic evidence as well.  But this statement

24  right here is a key point in all of the claims.  It's the

25  antithesis of a disclaimer of sweetening agents in the

1   prosecution history.  It is a claimer in the prosecution

2   history, to the extent that there is any ambiguity in the art.

3            **THE COURT:**  The disputed term, though, is flavoring

4   and not flavorant.

5            **MR. GAEDE:**  That's correct, but what they're saying

6   here "not anticipate adding flavorants or sweetening agents to

7   the gelatin capsules," which is a key point in all the claims.

8   They are telling the world the key point in all the claims is

9   that you can add sweetening or flavorants to that gelatin

10  capsule.

11           **THE COURT:**  You can add either, or.

12           **MR. GAEDE:**  That's right.  And both come under the

13  word "flavoring."  And sugar clearly is water soluble and

14  clearly is a flavoring.

15           **THE COURT:**  I don't understand.  Are you all in

16  dispute?  I mean, it seems to me there is a recognition that

17  flavor is not the same thing as sweetener.  I'm not exactly

18  sure I understand the point of the dispute between both sides

19  here.

20           **MR. GAEDE:**  Sure.

21           **THE COURT:**  Flavor is different than sweetener.  I'm

22  not sure; is the point of the defense that the plaintiff's

23  patent only covers when you add both?

24           **MR. GAEDE:**  No.  Water soluble flavoring, which is

25  the term used in the claim itself --

1          **THE COURT:**  Right.

2          **MR. GAEDE:**  That's a genus.  And there are species

3    within that that could be sweeteners, that could be flavorants,

4    that could be flavor, flavors, flavorenes.  But flavorene --

5    water soluble flavoring, and as claimed clearly here, in the

6    prosecution history --

7          **THE COURT:**  Can include both.  Water soluble

8    flavoring can be both or must be both?

9          **MR. GAEDE:**  It could be either, because the word --

10   the language of the claim is comprising within the genus of

11   water soluble flavoring or species, examples, such as

12   sweeteners or flavors.

13         **THE COURT:**  It could be either, meaning that it

14   could be no flavor but a sweetener?

15         **MR. GAEDE:**  Correct.

16         **THE COURT:**  Sweet fish oil?

17         **MR. GAEDE:**  In the gelatin capsule, yes, because

18   that changes the taste.  And flavor is tied to the sensation of

19   taste.  And one of your four sensations of taste is sweet.

20         **THE COURT:**  Yeah.  I have a real hard time with

21   that, just conceptually.

22         **MR. GAEDE:**  I think this statement right here in the

23   prosecution history is very clear that they are covering -- and

24   a key point in all the claims is that they cover flavorants or

25   sweetening agents.

1              **THE COURT:**  Okay.

2              **MR. GAEDE:**  And whether the art out there, which I

3    would contend covers both, identifies sweetening agents as a

4    form of flavoring, whatever that is, when it came time to tell

5    the world what their claims covered, they made a clear and

6    explicit statement that their claims covered sweetening agents

7    in the gelatin.  And that ties to the world "flavoring."

8              **THE COURT:**  Okay.  All right, we need move on.

9              **MR. GAEDE:**  Yep.

10             **THE COURT:**  The second one in terms of the defense's

11   briefing was the flavored gelatin capsule.  And I think both

12   sides -- both sides agree that that will depend upon the

13   court's interpretation of water soluble flavoring?

14             **MR. GAEDE:**  Yes.

15             **MR. SHARIATI:**  Yeah.

16             **THE COURT:**  So let's skip that one, and let's go to

17   the three wherein terms.  Part of the dispute is whether the

18   "present" means present in part of capsule, and we've already

19   heard those arguments.

20             **MR. SHARIATI:**  Yes, you have, Your Honor.

21             **THE COURT:**  And the remaining portion of those three

22   disputed terms is the -- whether "about" means approximately or

23   exactly, where plaintiff takes the position it means

24   approximately or within acceptable manufacturing tolerances,

25   and the defense's position is that it has to be present in the

1   exact -- within the range that is stated within the specific

2   range that's stated.

3              **MR. GAEDE:**  Correct.

4              **THE COURT:**  Okay?

5              Mr. Shariati.

6              **MR. SHARIATI:**  Well, the -- this is -- the argument

7   here is that, you know, we cited the cases from the Federal

8   Circuit that basically hold that, even when reciting critical

9   concentrations, "about" has to be given meaning.  I mean, the

10  case law is that every word in the patent matters.  And -- in

11  the claim matters.  And it should be given its normal and

12  ordinary meaning.

13              So, we think that the specification set out a

14  certain range, and it supports the claims and it's the same

15  range.  But, you know, there is no reason to read out the word

16  about from the claims.  There is no -- there is no disclaimer

17  of saying that it has to be precisely that range and that word

18  has to be given meaning.  That's really all there is.

19              **THE COURT:**  Okay.

20              All right, response, if any?

21              And the real problem I have with this one,

22  Mr. Gatey, is that, in two of the terms, about appears in the

23  third one, it doesn't -- how do I reconcile all of those if

24  they all mean exact?

25              **MR. GAEDE:**  Well, I think what you have to do, Your

Honor, is -- if you don't mind, I'll pull up quickly one of
their slides that they gave to me.

We did argue that because of the change in the
claims and the amendment of the claims that the limitations are
6 to 10 percent, or .5 to 1.5.  And they say the word about was
not added to overcome prior art.  And they are correct that the
word about was not added to the claims to overcome prior art,
but, because it wasn't in the claims originally, and I agree
with you, in the normal patent terminology, about gives a
little bit of wiggle room, approximately.  I'll agree with you
on that point.

But what happened?  In fact, that is wrong, what
they are saying.  What happened was when they brought in claim
28, and we saw how they already tied that to the preferred
embodiments, they told the Patent Office, and unfortunately, I
don't have a slide for this, but it's in the record, it's
Amendment B, they say in remarks, and this is the sentence
before the one we saw on preferred embodiments, it's Amendment
B on page 3:

"The last office action mailed on July 17, 2000, has
been carefully considered, and the claims have been amended to
more clearly define the patentability of the applicant's
invention over the prior art."  So they were amending to more
clearly define the claims over the prior art.  That's what they
told the Patent Office they were doing.

1          Now, what did they do?  They added the words between

2     about to modify about, and then they put in the .5 and the

3     1.5 percent of the said gelatin.  You may ask yourself, why

4     would they do that?  And they would do that for a reason that

5     is disclosed in the declaration that was attached as part of

6     the amendment.  And this is also cited in the joint claim

7     construction statement, our section about "about."

8          And in Mr. Opheim's declaration submitted to the

9     Patent Office, he avers:  "I tested a number of natural

10    flavorings for the gelatin capsules and found that suitable

11    flavoring occurred within a surprisingly narrow range of

12    concentrations, between about .25 percent and 1.5 percent

13    flavorings."  Very interesting, he uses the word between about

14    in this range.

15         And why would he use that language?  He used that

16    language because he then sets forth a table that's here.  And

17    he talks about -- and this is page 2 of the Opheim declaration.

18    It's in the Shariati declaration, Exhibit E.  And it was

19    Exhibit 1 to the amendment for the Patent Office.

20         And, in that chart, he has flavorings, percentage of

21    the shell.  And what's very interesting is that he is giving

22    examples that's within the range, and yet examples within the

23    range, some of them have harsh aftertastes.  That is

24    1.25 percent.  1 percent, somewhat distorted, harsh taste;

25    .75 percent; good natural taste; .5 percent, flavor off flavor;

1    1.5 percent, harsh taste, very soft capsule.

2            And so what he was telling the world, and what he is

3    averring in his declaration and why they modified the word

4    "about" to go to "between about," which reflects the language

5    in his declaration, was to say it's going to be in this range,

6    .5 to 1.5, but I can't tell you exactly which one is going to

7    work.  In other words, not every example within that range is

8    going to work because his own declaration proves that point.

9    And that's what he was trying to tell.

10           And so, when they use the word to modify "about" to

11   "between", and then put in the specific concentration

12   limitations, what he is saying, then, in those claims is that

13   it's going to be within this range, but not every one is going

14   to work.  He's not saying .3 percent as compared to .5, he's

15   saying it's within that range, but I can't tell you which one.

16   And that's because he was getting within the range harsh taste,

17   aftertaste.  And that's why he modified "about" to" between

18   about" and to define the concentrations.

19           And that language, which comes right out of his

20   declaration, was incorporated into the claims.  And so where

21   you see "between about" and the range, that's what's going on.

22   So it's within that range, but it doesn't mean every one in

23   there is operable.  And he can't tell you which one, as

24   compared to .5 to 1.5.  Anywhere withing that range will work.

25   So that's "between" and "about."

1            **THE COURT:**   Okay.   I think we can move on, then, to

2    gelatin softener.   The dispute is whether or not it should be

3    defined as a softener or plasticizer or the specific compounds

4    used to make gelatin capsules more flexible.

5            **MR. SHARIATI:**   Yeah.   We just wanted to, I think --

6    I don't think there is much of a dispute about the actual

7    definition.   We just want to put in some examples.   Let me make

8    sure I have the right slide here for a moment.

9            **THE COURT:**   Well, you don't say examples.   I mean,

10   it would seem to me the that if your proposed construction

11   should read compound used to make gelatin capsules more

12   flexible, such as glycerol, sorbitol or polyol.   But that is

13   not what you say, you say "specifically including."

14           This is a little confusing, because it's

15   specifically including all of these things?

16           **MR. SHARIATI:**   Well, we can -- we would agree to

17   "such as," Your Honor.   I mean, we figured specifically

18   including is an open list.   So it could be these or other

19   things.

20           **THE COURT:**   Well, what is your objection to softener

21   or plasticizer?   I mean, isn't that what's commonly referred to

22   in the industry as a softener, as a gelatin softener?

23           **MR. SHARIATI:**   Yeah.   There's two issues.   One is,

24   obviously, we want to provide some examples for the jury to

25   see, you know, so they have some concrete examples.   The other

1   one, again, is the sweetener issue, the sorbitol issue.  I want

2   to make sure that it's in the list, that's it's used as a

3   softener.

4               **THE COURT:**  Right, okay.

5               And the defense, I really hate proposed definitions

6   that include part of the term that you are purporting to

7   define.  Gelatin softener is either a softener or plasticizer?

8   Why isn't it just a plasticizer?

9               **MR. GAEDE:**  That's fine, too, Your Honor.

10              **THE COURT:**  Yeah.  Sometimes I don't understand all

11  these patent disputes, I mean, it seems to me gelatin softener

12  is something that you all ought to be able to agree on.  A

13  gelatin softener is a plasticizer, such as glycerol, sorbitol,

14  or other polyols; isn't that correct?

15              **MR. SHARIATI:**  That's fine.

16              **MR. GAEDE:**  That is correct.

17              **THE COURT:**  And what is the problem with just saying

18  that?

19              **MR. GAEDE:**  There is no problem with that.

20              **THE COURT:**  Then that's what we're going to say on

21  that one.

22              **MR. GAEDE:**  The only point I would want to make is

23  that it certainly doesn't exclude that sweetening agents, in

24  our view, are not just encompassed potentially in the word

25  "plasticizer," but it also can be flavor.  And that we read

```
 1   that as trying to limit it to excluding sort of sweetening --

 2           THE COURT:  No, it's just an example.

 3           MR. GAEDE:  Okay.

 4           THE COURT:  So it's going to read "a plasticizer,

 5   such as glycerol, sorbitol, or other polyols."

 6           Okay, let's move on to palatable and palatability,

 7   whether or not it means pleasant or acceptable.

 8           Once again, I think this is just one of those kind

 9   of, and I don't mean to be pejorative, but all patent cases

10   have these silly disputes, in my view.  I mean, clearly, having

11   -- you both agree that the taste has to be an acceptable taste;

12   the question is whether or not it has to also be pleasant?

13   Well, I don't read the references in the patent as requiring

14   pleasant.

15           Pleasant is many degrees higher than acceptable.  I

16   mean, it suggests something else.  Cake is pleasant, those

17   capsules are not.  I had one at the Markman, there is nothing

18   pleasant about it.

19                   (Laughter.)

20           MR. SHARIATI:  Well, you chewed it.

21           THE COURT:  Well, you said -- someone said it was

22   chewable.

23                   (Laughter.)

24           THE COURT:  But in any event, it seems to me that

25   there are references in the specifications to unpleasant.
```

1              **MR. SHARIATI:**  That's right.

2              **THE COURT:**  Okay, but the -- pleasant is many

3     degrees removed from unpleasant.

4              **MR. SHARIATI:**  Right.

5              **THE COURT:**  And I don't think that what the patent

6     is aiming at, is for a pleasant taste.  This is something that

7     is not unpleasant, all right?

8              And it would seem to me that if you are going to

9     rely upon the language of the patent, there is nothing in the

10    specification the says it has to be a pleasant taste.  The

11    specification suggests this the taste has to be a not pleasant

12    taste, and you have just taken it, I think, further than that

13    specification permits.

14             **MR. SHARIATI:**  Your Honor, the only -- and again, as

15    I think the Court said, we are sort of the angels on the head

16    of a pin territory here, but --

17             **THE COURT:**  Not exactly the word I used.

18             **MR. SHARIATI:**  Words to that effect.

19             The -- acceptable just means you can sort of hold

20    your nose and swallow it, and it's acceptable.  I think that's

21    the problem.  This is adding flavor, lemon, you know,

22    strawberry, to make it appealing to individuals.

23             **THE COURT:**  Palatable doesn't suggest that you are

24    going to like it.  Palatable suggests that you can tolerate it,

25    that it's okay, not that it's great.  I mean, it's just a

1   matter of degrees.

2           I think pleasant is just -- reflects a higher degree

3   than the specification permits.

4           **MR. SHARIATI:**  If that's what the Court thinks, then

5   I'm sure --

6           **THE COURT:**  Well, can you point to something in the

7   specification that actually uses the word "pleasant"?

8           **MR. SHARIATI:**  Standing here, no.

9           **THE COURT:**  No.  I saw lots of references to

10  unpleasant.  So it would seem to me that an appropriate

11  construction would be "having an acceptable or not unpleasant

12  taste."

13          **MR. GAEDE:**  Fine, Your Honor.

14          **MR. SHARIATI:**  That's fine.

15          **THE COURT:**  Okay.

16          All right, let's move to gelswatch.  Nordic states

17  in its papers that it's willing to agree to the defendant's

18  proposed construction; is that correct?

19          **MR. SHARIATI:**  Yes, Your Honor, but I just want to

20  add one point, just to make sure we don't walk into something

21  here we didn't intend to.

22          Obviously, we have a dispute with the defendants

23  about the flavoring aspects of the gelswatch.  We believe that

24  the flavor can be added -- you know, that the definition should

25  not exclude our position that the gelswatch can be made without

1  flavoring, and then the capsule could be flavored afterwards.

2  In other words, I think that --

3          **THE COURT:**  Well, how does their definition exclude

4  that?

5          **MR. SHARIATI:**  Their definition --

6          **THE COURT:**  "Mixture of gelatin, softener, water and

7  any additional components of gelatin" --

8          **MR. SHARIATI:**  It's the "any additional components."

9  I don't want them to argue that by agreeing to this definition

10  we have given up our argument that the flavoring could be added

11  after the gelswatch is made, the whole spray on versus baked in

12  argument.  I just don't want an implicit admission here.

13          **THE COURT:**  But the gelswatch is the actual

14  ingredients that comprise the capsule, correct?

15          **MR. SHARIATI:**  Yes.

16          **THE COURT:**  It's a mixture of that.

17          **MR. SHARIATI:**  That's right.

18          **THE COURT:**  Your position is that the additional

19  component of flavoring can be added but doesn't have to be.

20          **MR. SHARIATI:**  Yes, exactly right, exactly right.

21  That's our position.

22          **THE COURT:**  So how does this suggest that it can't

23  be?  In my view, that would allow for the adding of sweetener

24  as a separate component as well as flavoring.

25          **MR. SHARIATI:**  Okay, as long as that's understood,

1    we don't have a problem with that definition.

2         **MR. GAEDE:**  I think the only important part is in

3    the context of the claim in claim 16, which is where gelswatch

4    is used, it talks about mixing together --

5         **THE COURT:**  Right.

6         **MR. GAEDE:**  In the production process.  So it's not

7    as if you can add something later, it's a mixture.  And that's

8    the words that are in the claim, and that is why there is the

9    word "gelswatch," that means a mixture of gel and softener

10   water and any additional components of the gelatin capsule

11   shell.  And that claim term is in 16.

12        **THE COURT:**  All right.  Well, I'm not trying to do

13   anything other than to ascertain if there is agreement on this

14   one.

15        **MR. SHARIATI:**  There is agreement on this.

16        **THE COURT:**  All right, so plaintiff agrees to the

17   defendant's proposed construction.

18        **MR. SHARIATI:**  Yes.

19        **THE COURT:**  Okay.  So that leaves the last one, and

20   I'm not sure what the dispute is here, either.  There were two

21   typos on "flavored."

22        **MR. SHARIATI:**  We agreed that those typos would be

23   -- should be treated -- read as flavored.  I think we are in

24   agreement on that.

25        **THE COURT:**  Is there --

1          ***MR. GAEDE:***  There is no disagreement.

2          ***THE COURT:***  Is there any other dispute other than

3   the typos?

4          ***MR. SHARIATI:***  I don't think there is.

5          ***MR. GAEDE:***  Other than the fact that flavorene --

6   flavor and flavorene -- are synonyms in the scope of the

7   claims.  There is no different meaning for flavored versus

8   flavorene.

9          ***THE COURT:***  So it all goes back to the Court's

10  construction on the initial --

11         ***MR. SHARIATI:***  Flavor, that's correct.

12         ***THE COURT:***  Flavor.

13         ***MR. GAEDE:***  Correct.

14         ***THE COURT:***  Which is the first one.

15         ***MR. GAEDE:***  Correct.

16         ***THE COURT:***  Okay.

17         Anything else?

18         ***MR. SHARIATI:***  Just one --

19         ***THE COURT:***  I'm going to ask you to do one thing for

20  me --

21         ***MR. SHARIATI:***  Yes, Your Honor.

22         ***THE COURT:***  -- on the water soluble flavoring, since

23  that is the most important one.  I want to make sure I

24  understand the intrinsic evidence that both sides are relying

25  upon.  So, I'm going to take a short break, and then I want you

1   to just write it out for me, which ones, the references that

2   each one of you is relying upon for your respective position on

3   water soluble flavoring.

4            I know that -- I mean, there is just so much in the

5   joint claim construction statement, I want you just to point me

6   specifically to the ones -- I'm going to leave you my book of

7   slides and some Post-Its, and I want you to, assuming that all

8   the intrinsic references -- are they on the slides?

9            **MR. GAEDE:**  Probably not.

10           **THE COURT:**  Probably not?

11           **MR. GAEDE:**  I think it would be easy just to

12   identify for you quickly --

13           **THE COURT:**  Each of you just write them down on a

14   piece of paper, just so that I have something that --

15           **MR. SHARIATI:**  I'm sorry, which aspect of it -- are

16   you talking about the --

17           **THE COURT:**  Oh, the --

18           **MR. SHARIATI:**  Present throughout?

19           **MR. GAEDE:**  Sweetener and no sweetener, right?

20           **THE COURT:**  Sweetener and no sweetener.

21           **MR. SHARIATI:**  Okay.

22           **THE COURT:**  Otherwise, we've finished?

23           **MR. SHARIATI:**  Yeah.

24           I think just one little point.

25           Mr. Gatey made a reference to the ***Gentry Gallery***

1    case; this was added in the slides for the first time, so we

2    hadn't seen them before.  I just wanted to respond very, very

3    briefly that I think the distinction in this case and ***Gentry***

4    ***Gallery*** is that in ***Gentry Gallery***, as the Court says, this is a

5    dispute about a console in a recliner, and the specification

6    actually said the only -- the specification only says that the

7    only purpose of the console is to hold the controls; in other

8    words, there is an explicit, an almost explicit disclaimer in

9    the specification of anything else to do with the console or

10   where else the controls could be.  And this is in the

11   ***Gentry Gallery*** case.

12           ***THE COURT:***  Um-hmm.

13           ***MR. SHARIATI:***  So we hadn't seen this case before,

14   so I just wanted to respond.  I didn't want to let it go.

15           You know, I'm quoting from the case, it says, "The

16   original disclosure clearly identifies the console as the only

17   possible location for the controls.  It provides for only the

18   most minor variation in the location of the controls, noting

19   that the control may be mounted on the top or side console

20   rather than the front wall without departing from this

21   invention."

22           So, I don't think this is the case here.  In fact,

23   the opposite is true.  In this case, our -- the patents have

24   the language on column 4, starting on line 18, where it says,

25   "Those skilled in the art will appreciate that various

 1  adaptations and modifications of the just-described preferred

 2  embodiment can be configured without departing from the scope

 3  and the spirit of the invention; therefore, it is to be the

 4  invention" -- "therefore, it is to be understood that within

 5  the scope of this appended claims, the invention may be

 6  practiced other than as specifically described herein."

 7          So I just wanted to respond on the ***Gentry Gallery***

 8  case.

 9          ***MR. GAEDE:***  Two-sentence rejoinder.

10          This was simply given to you for the standard

11  proposition which I think the ***Phillips*** case reaffirms, is that

12  the intrinsic record -- the claim language is anchored in the

13  intrinsic record.  And all that ***Gentry Gallery*** is making the

14  point that there has to be some sort of disclosure, something

15  there.  You can't just sort of make up the invention, it's tied

16  to that intrinsic record that is presented.

17          ***THE COURT:***  That's what I understood you to mean.

18          All right, last thing on the motion to strike and

19  the request for judicial notice:  The plaintiff has moved to

20  strike the sealed declaration, and indeed, this declaration was

21  submitted in violation of Local Rule 4-2 and 4-3, which require

22  disclosure of any claim construction experts at the time you

23  make your preliminary claim construction disclosure to opposing

24  counsel and again at the time of the joint claim construction

25  statement.

 1          Is there any reason why I shouldn't strike this?

 2          **MR. GAEDE:**   The only reason why is that in their

 3   opening brief they said how one of ordinary skill in the art

 4   would interpret certain claimed terms, and yet then they were

 5   making these statements in their opening brief they provided no

 6   evidence of how one of ordinary skill in the art would

 7   interpret it.  And so that was evidence to rebut their

 8   statements in their opening brief, that these are how these

 9   claimed terms can be construed by one of ordinary skill in the

10   art without any basis in the record for making such an

11   assertion.

12          **THE COURT:**   And then, the request for judicial

13   notice, this is your request for judicial notice.  You

14   submitted along with a declaration some portions of the

15   prosecution history that weren't included in your opposition.

16   Why?

17          **MR. GAEDE:**   Oh, it -- just simply to stand for the

18   proposition, the point that I was making, and I'm sure

19   Mr. Shariati wouldn't disagree with me, that that claim 28 that

20   was already described in that Amendment B and C that were part

21   of the materials that were submitted to the Court, that, in

22   fact, that did just issue as claim 1 of the '231 patent.  And

23   those couple of subsequent documents which were cited in the

24   joint claim construction statement, but not submitted as part

25   of the declaration, that the -- that, in fact, all it does is

1    confirm that claim 28 issued as claim 1.

2            **THE COURT:**  But you give the plaintiff no

3    opportunity to respond when you submitted after the briefings.

4            **MR. GAEDE:**  Well, it came because of their reply

5    brief.  In their reply brief, they were making the argument

6    that we were -- that the claims scope had been tied to the

7    preferred embodiments.

8            And, indeed, when you look at what was there in

9    claim 28 and the subsequent, what happened, there and those

10   couple extra ones that complete out the record showing how

11   claim 28 played out, it shows that they did, in fact, tie it to

12   the preferred embodiment.  And that argument was very clearly

13   made in their reply brief.

14           **THE COURT:**  Um-hmm.

15           Anything?

16           **MR. SHARIATI:**  Submitted.

17           On this point, it's essentially, you know, in our

18   view, you know, improper sur-rebuttal.  I mean, I think the

19   points that we made in our reply brief were sufficient record.

20   And, you know, there were sufficient documents in the record to

21   support that.

22           By the way, claim 25 which was dropped -- that was

23   dropped, and claim 28 was, you know, was allowed, claim 25 just

24   had a lower bound on the flavor, it didn't have a higher bound.

25   And so it -- all they did was to -- was to put the higher bound

```
 1    on it.  So that doesn't really, you know -- it wasn't a big --
 2    it wasn't a big, big change.  It was -- just went from -- they
 3    put an upper bound on it.
 4              THE COURT:  All right.
 5              With regard to the request for judicial notice,
 6    given that so much of the prosecution history was already
 7    submitted I'll permit it, even though it was late.  So the
 8    motion to strike or to deny that is -- no, I'm sorry, it was
 9    the defense's motion for judicial notice that will be granted.
10    However, with to the declaration, I think that's totally
11    unacceptable to file the declarations later.
12              MR. GAEDE:  Can we -- we would then counter-move to
13    strike their reply declaration.
14              THE COURT:  All right, both are stricken.
15              All right, now, I'm going to -- we are going to
16    adjourn.  If you would just write down on the question of
17    flavor versus sweetener, that's the one.  I want you to
18    write -- just point me to the intrinsic references that you
19    believe, starting first with the claims, if any, next with the
20    specifications, and next with the patent history, and then with
21    any extrinsic evidence.
22              MR. GAEDE:  Yes, Your Honor.
23              THE COURT:  Just give me the references so that I
24    can have something easy to look at.
25              MR. GAEDE:  Okay.
```

1              THE COURT:   Okay, great.   Thanks.

2                   (Proceedings adjourned at 11:25 a.m.)

3

4                              `

5                        ---o0o---

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## <u>CERTIFICATE OF REPORTER</u>

I, Sahar McVickar, Official Court Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.  The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

_____

**Sahar McVickar, RPR, CSR No. 12963**

**Thursday, May 1, 2008**